UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>RUDY DEKERMENJIAN,<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Criminal No. 20- cr-10172 -_____

Violations:

Count One:   Conspiracy to Commit Wire Fraud
Affecting a Financial Institution and Bank Fraud
(18 U.S.C. § 1349)

Count Two:  Alteration and Falsification of Records
(18 U.S.C. § 1519)

Forfeiture Allegation:
(18 U.S.C. § 982(a)(2))

INFORMATION

At all times relevant to this Information:

General Allegations

A.  Key Individuals and Entities

1.      RUDY DEKERMENJIAN ("DEKERMENJIAN") was a resident of Glendale, California.

2.      Company A was an online payment processing company headquartered in Los Angeles, California.

3.      Company A provided online merchants with the ability to accept payment card transactions and process those transactions through payment card networks such as MasterCard and Visa.  Among other services, Company A obtained, on behalf of its merchant customers, merchant bank accounts and related merchant payment processing services from financial institutions.  Company A accomplished this by entering agreements with "Acquirers," which were financial institutions in the United States, Europe, and elsewhere that were members of the payment card networks.  In some cases, Company A entered agreements directly with the

Acquirers. In others, Company A entered agreements with Acquirers through intermediary companies.

4.    DEKERMENJIAN, a lawyer, was an independent contractor who provided legal services to Company A. Company A referred to DEKERMENJIAN as its General Counsel.

5.    Executive 1 was the Chief Operating Officer of Company A.

6.    Executive 2 was the Vice President of Operations of Company A.

7.    Merchant A held itself out as a student-loan debt-relief company headquartered in Rancho Santa Margarita, California.

8.    Merchant Owner 1 and Merchant Owner 2 each owned an approximately 50-percent stake in Merchant A. Merchant Owner 1 sought DEKERMENJIAN's assistance in obtaining payment card processing through Company A. DEKERMENJIAN assisted Merchant A in obtaining payment card processing through Company A and received commissions from Company A based on the dollar value of transactions that Merchant A processed through Company A.

9.    Fifth Third Bank, headquartered in Cincinnati, Ohio, was a financial institution as defined in 18 U.S.C. § 20. Fifth Third Bank was an Acquirer and a member of various payment card networks, including Visa and MasterCard. Both directly and through its own payment processing agents, Fifth Third Bank provided accounts that merchants could use to process payment card transactions. In or about October 2013, Company A entered into an agreement with Fifth Third Bank through an agent of the bank whose principal place of business was in Lowell, Massachusetts. (Fifth Third Bank and its payment processing agents are referred to collectively herein as "Fifth Third").

10.    The Consumer Financial Protection Bureau ("CFPB") was an independent regulatory agency of the United States government tasked with ensuring that consumer debt

products are safe and transparent.  The agency had the authority to conduct investigations, issue

subpoenas and civil investigative demands, initiate administrative adjudications, and prosecute

civil actions in federal court.

    B.  <u>Background of the Fraud Scheme</u>

    11.     On or about March 29, 2016, Merchant A filed a payment processing application

with Company A.  Merchant A's application used both its true legal name and its trade name,

which identified it as a student-loan company.  The application expressly stated that the company

was involved in the student-loan industry—specifically, "document preparation services" for

"student loans."  The application listed the website through which Merchant A conducted its

student-loan business.  The application also stated that Merchant Owner 1 and Merchant

Owner 2 each owned 50 percent of Merchant A.

    12.     Beginning in or about April 2016, Company A provided payment processing

services for Merchant A.  Company A processed Merchant A's transactions primarily through

Fifth Third.

    13.     In or about May 2017, Fifth Third conducted additional risk diligence on

Merchant A and decided to terminate its relationship with Merchant A.  Fifth Third informed

Company A of its decision on or about May 23, 2017, stating that its risk team had declined the

account, and Company A informed Merchant A of the termination that same day.

    14.     Executives 1 and 2, Merchant Owners 1 and 2, and others known and unknown to

the United States Attorney, thereafter agreed to engage in a fraudulent scheme to continue to

obtain payment processing for Merchant A through Fifth Third.  DEKERMENJIAN soon joined

the scheme and, as a result, earned commission payments totaling approximately $20,293 on the

fraudulently obtained processing.

<u>Objects and Purposes of the Conspiracy</u>

15.     The objects of the conspiracy were to commit wire fraud and bank fraud.  The principal purposes of the conspiracy were to earn money through commissions on payment card processing for Merchant A by misrepresenting the identity of Merchant A and the nature of Merchant A's business in order to fraudulently induce Fifth Third to provide payment card processing services, including access to a merchant bank account, that it would have otherwise refused to provide, and to process payment card transactions it would have otherwise rejected.

<u>Manner and Means of the Conspiracy</u>

16.     Among the manner and means by which coconspirators known and unknown to the United States Attorney, including Executives 1 and 2, Merchant Owners 1 and 2, and DEKERMENJIAN, carried out the conspiracy and the scheme to defraud were the following:

a.     Using "Sham Merchants"—non-existent businesses that purported to sell housewares, toys, jewelry, leather goods and other retail items, all of which would appear to Fifth Third to involve significantly less risk than Merchant A's student-loan business;

b.     Obtaining payment card processing in the Sham Merchants' names through Fifth Third without disclosing that the Sham Merchants were in fact fronts for Merchant A and that the transactions involved student-loan debt-relief, not retail goods;

c.     Creating fake websites ("Transaction Laundering Websites") through which the Sham Merchants purported to sell the above-described retail products.  The Transaction Laundering Websites did not process transactions but existed only to conceal from Fifth Third and other

4

participants in the payment card networks the identity of Merchant A and the nature of the transactions Merchant A was processing; and

d.      Misrepresenting the nature of Merchant A's online transactions to Fifth Third and other participants in the payment card network by miscoding them as retail transactions and omitting from the transactions' descriptions any reference to lending.

17.      In this fashion, from in or about June 2017 to in or about April 2018, DEKERMENJIAN, together with Executives 1 and 2, Merchant Owners 1 and 2, and other employees at Company A, fraudulently obtained payment processing for Merchant A, using the accounts and facilities of Fifth Third.  During this time period, Company A fraudulently processed through Fifth Third more than approximately $5.4 million in Merchant A transactions.

<u>Acts in Furtherance of the Conspiracy</u>

18.      From in or about June 2017, through in or about April 2018, DEKERMENJIAN, together with Executives 1 and 2, Merchant Owners 1 and 2, and coconspirators known and unknown to the United States Attorney, committed and caused to be committed the following acts, among others, in furtherance of the conspiracy and the scheme to defraud:

19.      In or about June 2017, at the direction of Executive 2, Merchant A prepared false applications for payment processing in the names of two Sham Merchants.  Merchant A submitted these false applications to Company A, which, in turn, knowingly provided the false information contained in these applications to Fifth Third in order to fraudulently process payment card transactions for Merchant A.

*Sham Merchant "Natural Nine Staffing Inc."*

20.      Specifically, on or about June 4, 2017, Merchant Owner 1 prepared an application for payment processing in the name of Sham Merchant "Natural Nine Staffing Inc.," d/b/a

"Natural Nine Online." The application falsely stated that "Natural Nine Online" was an "online retail store" that sold "consumer goods: houseware, toys, jewelry." The application listed the Sham Merchant's website as "naturalnineonline.com"—a Transaction Laundering Website. The application stated that the Sham Merchant's estimated monthly processing volume was $1.2 million. The application listed an employee of Merchant A as the sole owner of "Natural Nine Online" and stated: "Referred by: Rudy Dekermenjian."

21.     On or about June 4, 2017, Merchant Owner 1 emailed the processing application for "Natural Nine Online" to Executive 1, copying DEKERMENJIAN, Executive 2, and others at Company A. Company A, in turn, knowingly provided the false information contained in the "Natural Nine Online" application to Fifth Third to initiate processing for Merchant A in the name of this Sham Merchant. Company A falsely coded "Natural Nine Online's" transactions as "Miscellaneous General Retail."

22.     On or about June 9, 2017, Company A's Compliance Department sent an email to Merchant Owner 1, reminding him that with respect to the Sham Merchant "Natural Nine Online," "[w]e can have zero relation between the terminated [Merchant A account] and your new business venture."

*Sham Merchant "True Count Staffing Inc."*

23.     On or about June 12, 2017, Merchant Owner 1 prepared and signed a second Sham Merchant application for payment processing in the name of "True Count Staffing Inc.," d/b/a "True Count Student." The application falsely stated that this Sham Merchant was an "Online Retail Store" that sold "Consumer Goods & Electronics." The application listed the Sham Merchant's website as "truecountstudent.com"—another Transaction Laundering Website. The application stated that the Sham Merchant's estimated monthly processing volume was $1.5

million and that Merchant Owner 1 owned 100 percent of the Sham Merchant.  The application further stated:  "Referred by:  Rudy Dekermenjian."

24.     On or about June 14, 2017, Merchant Owner 1 emailed the processing application for "True Count Staffing, Inc." to Executive 1, copying DEKERMENJIAN, the Underwriting Manager for Company A, and Executive 2.

25.     On or about June 15, 2017, the Underwriting Manager for Company A replied to Merchant Owner 1 and Executive 1, copying DEKERMENJIAN, Executive 2, and others, stating:  "Hi [Merchant Owner 1], need you to make the [Transaction Laundering Website] a little more appealing. You also cannot reference the word 'students' anywhere on the site including the URL as it raises concern.  The website needs to make sense, the products, the pricing, the name of the URL, everything you are displaying on there. You also want to mention in the offer details that these are custom made hand bags since you do not have a supplier."

26.     On or about June 15, 2017, Merchant Owner 1 replied to the Underwriting Manager, copying Executives 1 and 2, and DEKERMENJIAN:  "Can we keep the URL (truecountstudent.com)[?] We can make the other changes you requested."  Executive 2 replied to all:  "This is not ok!  Please change.  I can't risk my bank."  Merchant Owner 1 replied to all that he would "acquire another URL and move the content over."

27.     On or about June 27, 2017, Merchant Owner 1 emailed Executive 1, copying Executive 2, the Underwriting Manager, and DEKERMENJIAN:  "Hi Everyone, Please find the new website for True Count Staffing Inc. here:  http://truepslc.com/[.]  We will be adding more items throughout the day.  We are making sure that the pricing accurately reflects the products."  Merchant Owner 1 asked the recipients to proceed with Merchant A's Sham Merchant payment processing application.

28.     On or about June 30, 2017, Company A knowingly provided false information concerning "True Count Staffing Inc." to Fifth Third to initiate processing for Merchant A in the name of "True Count Staffing Inc."  Company A falsely coded this Sham Merchant's transactions as "Miscellaneous General Retail."

29.     On or about July 3, 2017, DEKERMENJIAN emailed Executive 2 regarding his commission payments and indicated that he was to receive commissions from payment processing for three entities:  "The original is [Merchant A]. Second is Natural Nine Staffing Inc., and third is True Count Staffing Inc. below. Please make sure all three are under my company name, Toro Group, LLC as the reseller, thanks."  Shortly thereafter, Executive 2 replied:  "HI Rudy, Yes, all three accounts are under Rudy DEKERMENJIAN - Commission account."

30.     On or about August 18, 2017, DEKERMENJIAN emailed Executive 1 regarding Company 1's pricing for the Merchant A relationship, as Merchant A had requested to add two additional payment card brands for processing through the Sham Merchants.  Executive 1 replied with suggested pricing terms and told DEKERMENJIAN:  "You must remember, they cant find homes, that's why they need us.  so sell them high and make money."

### Obstruction of Government Investigations

31.     On or about June 14, 2019, DEKERMENJIAN met in person with Merchant Owners 1 and 2 and an employee of Merchant A at a restaurant in Los Angeles.  They discussed the fact that DEKERMENJIAN had prepared altered versions of the Sham Merchant payment processing applications for Natural Nine Staffing, Inc. and True Count Staffing, Inc. DEKERMENJIAN brought the altered documents with him in electronic format on a USB flash drive.

32.    Immediately after the meeting, DEKERMENJIAN, Merchant Owners 1 and 2, and the Merchant A employee drove to a nearby FedEx Office store, where DEKERMENJIAN printed out the altered applications for Merchant Owner 1 and the Merchant A employee to sign. The applications differ from the original Sham Merchant applications for Natural Nine Staffing, Inc. and True Count Staffing, Inc. in at least the following ways:

    a.    Unlike the original Sham Merchant application for Natural Nine Staffing, Inc., DEKERMENJIAN's altered payment processing application contained Merchant A's true website address (not the Transaction Laundering Website), and stated that Natural Nine Staffing was a "Student Loan Consolidation" company that provided "Document preparation services." The application stated that Natural Nine Staffing's estimated monthly processing volume was $100,000, instead of $1.2 million, and removed the notation that DEKERMENJIAN had referred the merchant. The application was backdated to June 4, 2017 (the same date as the original Sham Merchant application).

    b.    Unlike the original Sham Merchant application for True Count Staffing, Inc., DEKERMENJIAN's altered payment processing application contained Merchant A's true website address (not the Transaction Laundering Website), and stated that True Count Staffing was a "student loan document preparation" company that provided "processing and customer service." The application stated that True Count Staffing's estimated monthly processing volume was $150,000, instead of $1.5 million, and removed the notation that DEKERMENJIAN had referred the merchant. The application was backdated to June 12, 2017 (the same date as the original Sham Merchant application).

33.     When DEKERMENJIAN altered the Sham Merchant applications, he was aware of the following:

      a.  On or about November 2, 2018, a federal grand jury sitting in and for the District of Massachusetts issued a subpoena to Company A for, among other things, "all records concerning merchants involved in . . .  loans [and] debt collection"; "all records concerning the assignment of new merchant identification numbers to merchants, including merchants that were previously terminated or suspended"; and "all records concerning changes to the content of merchant websites or the creation of merchant websites."

      b.  On or about May 9, 2019, the CFPB issued a civil investigative demand ("CID") to Company A seeking, among other things:  "All contracts or agreements, including notes or records of all oral agreements, entered into between the [Company A] and [True Count Staffing Inc. and Natural Nine Staffing Inc.]," and "All applications, compliance questionnaires, and supporting documents that [True Count Staffing Inc. and Natural Nine Staffing Inc.] provided in connection with obtaining products or services from [Company A]."

34.     Company A produced DEKERMENJIAN's altered applications to the CFPB in response to its May 9, 2019 CID.  The documents were incorporated as exhibits in a civil complaint filed by the CFPB alleging various fraudulent and deceptive business practices by Merchant A.

35.     Company A never produced to the Massachusetts federal grand jury the Sham Merchant applications or its communications with Merchant Owner 1 in which Merchant Owner 1 transmitted those applications to Company A.

## COUNT ONE
Conspiracy to Commit Wire Fraud Affecting a Financial Institution and Bank Fraud
(18 U.S.C. § 1349)

The United States Attorney charges:

36.     The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 30 of this Information.

37.     From in or about June 2017, through in or about April 2018, in the District of Massachusetts, and elsewhere, the defendant,

## RUDY DEKERMENJIAN,

conspired with Executive 1, Executive 2, Merchant Owner 1, Merchant Owner 2, and others known and unknown to the United States Attorney to:

1) commit wire fraud affecting a financial institution, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, which scheme affected a financial institution, that is, Fifth Third Bank, to transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the scheme to defraud, in violation of Title 18, United States Code, Section 1343; and

2) commit bank fraud, that is, to knowingly execute and attempt to execute a scheme and artifice to defraud a financial institution, namely Fifth Third Bank, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of Fifth Third Bank, by means of materially false and fraudulent

pretenses, representations, and promises, in violation of Title 18, United State Code,

Section 1344.

All in violation of Title 18, United States Code, Section 1349.

## COUNT TWO
Alteration and Falsification of Records
(18 U.S.C. § 1519)

The United States Attorney further charges:

38.     The United States Attorney re-alleges and incorporates by reference paragraphs 1 through 35 of this Information.

39.     On or about June 14, 2019, in the Central District of California, and elsewhere, the defendant,

RUDY DEKERMENJIAN,

did knowingly alter and falsify records, documents, and tangible objects, with the intent to impede, obstruct, and influence the investigation and proper administration of any matter within the jurisdiction of any department and agency of the United States, specifically, a federal grand jury investigation pending in the District of Massachusetts and an investigation by the Consumer Financial Protection Bureau.

All in violation of Title 18, United States Code, Section 1519.

## FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(2))

The United States Attorney further alleges:

40.     Upon conviction of the offense in violation of Title 18, United States Code, Section 1349, set forth in Count One of this Information, the defendant,

### RUDY DEKERMENJIAN,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), any property constituting, or derived from, proceeds obtained directly or indirectly, as a result of such offense.  The property to be forfeited includes, but is not limited to, the following assets:

     a.   $20,293 to be entered in the form of a forfeiture money judgment;

41.     If any of the property described in Paragraph 40, above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(2), as a result of any act or omission of the defendant—

     a.   cannot be located upon the exercise of due diligence;

     b.   has been transferred or sold to, or deposited with, a third party;

     c.   has been placed beyond the jurisdiction of the Court;

     d.   has been substantially diminished in value; or

     e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the property described in Paragraph 40 above.

All pursuant to Title 18, United States Code, Section 982(a)(2).

Respectfully submitted,

ANDREW E. LELLING
United States Attorney


*/s/ David J. D'Addio*

By:    DAVID J. D'ADDIO
       SETH B. KOSTO
       Assistant U.S. Attorneys


       DEBORAH L. CONNOR
       Chief, Money Laundering and
       Asset Recovery Section


*/s/ Randall Warden*

By:    RANDALL WARDEN
       Trial Attorney
       Department of Justice, Criminal Division
       Money Laundering and Asset Recovery Section
       Bank Integrity Unit

Date:  August 28, 2020